## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### *Southern Division*

ROBIN BECK-PELL,        *

    Plaintiff,        *

v.        *      **Case No.: PWG-17-2329**

SHEET METAL WORKERS LOCAL    *
    #100,
                        *

    Defendant.        *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION AND ORDER

Robin Beck-Pell, who is proceeding without counsel, is an African-American, female, sheet metal worker over the age of 40 who was a member of the Sheet Metal Workers Local #100 ("Local 100" or the "Union"). Am. Compl. 6, ECF No. 5. She believed that contractors were hiring workers in other classes—younger workers, male workers, and workers who were not African-American or Black. *Id.* She complained to Local 100 about this perceived discrimination, but Local 100 did not act on her behalf. *Id.* She filed suit, alleging race, color, sex, and age discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634 ("ADEA"), as well as breach of contract. Compl. 4–6, ECF No. 1; *see* Am. Compl.[1]

---

[1] Beck-Pell also checked the box for discrimination in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112–12117 ("ADA"), on her Complaint, but did not provide any basis for this claim in her Amended Complaint or Opposition. Additionally, in her Opposition, she states that her discrimination claims arise under Title VII and the ADEA. Pl.'s Opp'n 1. Thus, to the extent Beck-Pell's pleadings include an ADA claim, it is dismissed for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6), 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Ms. Beck-Pell also listed "breach of contract" in her original pleading, Compl. 5, but I cannot discern a

Now pending is the Motion for Summary Judgment, ECF No. 40, that Local 100 filed.[2]   Because

Ms. Beck-Pell cannot prevail on any of her claims, I will grant Defendant's motion.

### **Factual Background[3]**

"Local 100 is a labor organization that negotiates and enforces collective bargaining

agreements covering sheet metal construction workers [both apprentices and journeymen (who

have completed their apprenticeships)] in Maryland, Virginia, the District of Columbia, and

several counties in West Virginia."  LaBille Decl. ¶ 2, ECF No. 40-3 (Declaration of President and

Business Manager of Local 100); *see* Pl.'s Opp'n 2.  Local 100 "is affiliated with the International

Association and is governed by its [International Association of Sheet Metal, Air, Rail and

Transportation Workers] Constitution and Ritual" ("Constitution and Ritual").  LaBille Decl. ¶ 30;

*see* Const. & Ritual, ECF No. 40-3, at 106.

> To assist its members in obtaining employment, Local 100 operates a
> referral system. Local 100's system is a nonexclusive referral system, which means

---

[2] The parties fully briefed the motion.  ECF Nos. 40-1, 43, 44.  A hearing is not necessary.  *See* Loc. R. 105.6.  Plaintiff's Opposition includes two pages of a "Memorandum," Pl.'s Opp'n 1–2, three pages of an unsigned "Declaration," *id.* at 3–5, one page of "Summary Argument," *id.* at 6, an unsigned "Verification" in which she "declare[d] under penalty of perjury that the facts stated in [her] foregoing response to Defendant's Interrogatories Request are true and correct to the best of my knowledge, information, and belief," *id.* at 7, and a Certificate of Service, *id.* at 8.  Because neither the Declaration nor the Verification is signed under penalty of perjury (or otherwise), the Declaration does not constitute an affidavit or declaration for evidentiary purposes.  I will consider it as part of Plaintiff's Opposition, however, and I note that, even if it were sworn, it would not create a genuine dispute of material facts, as the discussion in this Memorandum Opinion shows. I will refer to these filings collectively as "Plaintiff's Opposition" and cite pages using the numbers assigned on the electronic case filing system.

The footnote marker [2] in the main text references the following, which appears as the first footnote block on the page:

[This] breach of contract claim in the narrative she provided in her Amended Complaint, Am. Compl. 6, and neither party discussed breach of contract in briefing Defendant's motion.  Accordingly, insofar as Beck-Pell included a breach of contract claim in her pleadings, it also is dismissed for failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(6), 8(a)(2); *Ashcroft*, 556 U.S. at 678–79.

[3] To decide Local 100's Motion for Summary Judgment, I consider the facts in the light most favorable to Ms. Beck-Pell as the non-moving party, drawing all justifiable inferences in her favor. *Ricci v. DeStefano,* 557 U.S. 557, 585–86 (2009).

that any member, other than an apprentice, has the right to solicit a job with any local or out-of-town contractor within the jurisdiction of Local 100 regardless of the member's position on the unemployment list. Likewise, any signatory contractor, whether local or out-of-town, has the right to offer any member of Local 100 a job regardless of the member's position on the unemployment list. Signatory contractors also can fire from any source without regard to the referral list.

Upon lay off, Local 100 members sign an unemployment list maintained by Local 100. Local 100 then sends that list out each Friday to its signatory contractors, and the contractors are free to either hire from the list or from other sources.

. . .

A member's spot on the unemployment list rises when individuals above them on the list notify the union that they have been hired. Upon being laid off, members return to the bottom of the list.

LaBille Decl. ¶¶ 5–6, 24. While Local 100 will "do what they can to assist members in obtaining work," Local 100 "members have the ultimate responsibility for obtaining their own employment with one of Local 100's signatory contractors. And Local 100's signatory contractors are ultimately responsible for making hiring decisions." *Id.* ¶¶ 9–10.

Robin Beck-Pell completed her sheet metal work apprenticeship and became a sheet metal mechanic in 2001 or 2002. Beck-Pell Dep. 26:16–27:2, ECF No. 40-4. At the time, she already was a member of the Local 100. *See* Member Hr. Listing, ECF No. 40-3, at 16. "In 2004 [she] was laid off, for what [she] believed to be age and race discrimination." Pl.'s Opp'n 3, ¶ 2. She filed an administrative complaint with the EEOC and received a Notice of Right to Sue but did not pursue the matter further "because [she] went back to work." *Id.*

Since January 2010,[4] when she completed her job assignment with Dynamic Systems, Inc. at the National Ball Park, Beck-Pell has been seeking Local 100's assistance in procuring work. Am. Compl. 6; Member Hr. Listing, ECF No. 40-3, at 12. She "put [her] name on the [Union's]

---

[4] Ms. Beck-Pell claims that she began seeking a new position in 2009, but the Member Hour Listing shows that her unemployment did not begin until January 2010. Member Hr. Listing, ECF No. 40-3, at 12.

out-of-work list," and she has "called and [gone] out on Job sites to look for work," but without success.  Am. Compl. 6; *see* Pl.'s Opp'n 3, ¶ 3.   She claims, without elaboration, that "[t]he [unemployment] list that the union has is not accurate."  Pl.'s Opp'n 4, ¶ 8.

Ms. Beck-Pell alleges that the contractors would tell her that she "had to go thru [sic] the union in order to be employed at one of the Job sites," but, "[w]hen [she] went to the Union Hall they were still saying that there was no work." Am. Compl. 6; *see* Pl.'s Opp'n 3, ¶ 3.   Ms. Beck-Pell did, however, receive one job assignment through Local 100: She "was refer[red] to a job from the local in 2012 after not working, since 2010" and she worked briefly for a company called Critchfield Mechanical, Inc. in August and September 2012. Pl.'s Opp'n 4, ¶ 5 (stating that she "work[ed] for 6 days with Critchfield Mechanical, Inc."); *see* Member Hr. Listing, ECF No. 40-3, at 12 (20 hours worked in August 2012 and 80 hours worked in September 2012).

On July 16, 2013, Ms. Beck-Pell complained about the hiring process to Local 100 representatives because "males were getting employment" while "[n]o black females over the age of 40 w[ere] being picked up for work." Am. Compl. 6; *see* Pl.'s Opp'n 4, ¶ 4.   In her grievance letter, she stated that "[t]he union reps of local #100 are aware that there are no black females, journeymen, over the age of 40, . . . working [sic] for any contractors in local #100," and "[t]he sheet metal workers union local has not addressed this situation."  July 16, 2013 Grievance Ltr., ECF No. 40-3, at 95.  She stated that it could be retaliation because the black, female journeymen "had filed a suit against one of the local #100 contractor[]s" and, "since that incident occurred, [they] have not been able to get work with any local contractors."  *Id.* She explains in her Opposition that her grievance was "against the Local 100 for not protecting [her] rights as a union member[;] [she] was not going to file[] against the contractor[]s." Pl.'s Opp'n 4, ¶ 7.

In response to the grievance letter, Local 100 clarified that it "does not operate an exclusive hiring hall" and that "union members may apply for work directly with signatory contractors." Nov. 1, 2013 Ltr. to Beck-Pell, ECF No. 40-3, at 99. Beck-Pell insists that, "once[] [she] became a journeyman, every job [she] worked, [she] was referred through the hall." Pl.'s Opp'n 4, ¶ 9 (capitalization removed). Because Beck-Pell was complaining about the contractors' failure to hire her and other black women over the age of 40, Local 100 provided guidance for "pursu[ing] a grievance or grievances against contractors." *Id.*

> Local 100 asked [her] to provide information about the contractor[]s that refused to hire [her], so, [she] needed to provide facts to support what [she] was saying. They wanted the names of the contractors to which [she] had applied for employment, the positions for which [she] had appl[ied], evidence that the contractor had openings at the time that [she] applied, and the contractor's response to [her] application and the date of the response.

Pl.'s Opp'n 4, ¶ 6; *see* Nov. 1, 2013 Ltr. to Beck-Pell, ECF No. 40-3, at 99. She did not provide any additional information, and Local 100 did not file a grievance on her behalf. Beck-Pell Dep. 176:5–178:3. Beck-Pell herself filed an EEOC charge of discrimination based on age, sex, and race against Local 100 in August 2014. *See* 2018 EEOC Charge, ECF No. 40-3, at 127 (discussing earlier charge); Am. Compl. 6.

Ms. Beck-Pell made her final dues payment on September 30, 2014, when she paid dues through August 31, 2014. Member Payment Hist., ECF No. 40-3, at 104. On November 3, 2014, when her September and October dues had not been paid, Local 100 informed her that, "as of November 1, 2014, [she was] suspended in accordance with Sheet Metal Workers' International Association Constitution and Ritual and Local 100's rules and regulations." Nov. 3, 2014 Ltr., ECF No. 40-3, at 105. It notified her that, up until December 31, 2014, she could pay a reinstatement fee of $250.00, in addition to one month's dues ($34.50), for a total of $284.50. *Id.*

Ms. Beck-Pell claims that, on an unspecified date, she "tried to pay [her] union dues," but Local 100 "refused to take [her] payments." Am. Compl. 6. According to Beck-Pell, she "contacted the local to determine how much [she had] to pay to get back in the local and be reinstated as a member," and they "advised [her that] she had to pay 284.50." Pl.'s Opp'n 4, ¶ 9. But she did not attempt to pay until April 2017, "[w]hile the [2014] EEOC matter was ongoing," at which time Local 100 informed her that it did not "want [her] money and [she] needed to get a job first." *Id.*; *see* Apr. 2, 2018 Witness Stmt. 2, ECF No. 43-12 (Beck-Pell's unsigned statement). She viewed that response as retaliatory and filed an EEOC complaint alleging retaliation. Pl.'s Opp'n 4, ¶ 9; *see* 2018 EEOC Charge. According to LaBille:

> It is a standing policy of Local 100 that in order to reinstate membership in Local 100 following a suspension, an individual must first obtain employment in the industry and then request reinstatement and pay the appropriate fees. Local 100 adopted this policy to prevent the situation where an individual would spend hundreds of dollars to be reinstated only to quickly fall behind on their dues again because they could not find employment

LaBille Decl. ¶ 32.

In late July 2017, two months after she received her Notice of Right to Sue regarding her 2014 EEOC charge, she again "tried to get back into the Union and pay [her] union dues," but she did not succeed. 2018 EEOC Charge. Soon after, Beck-Pell filed this lawsuit on August 4, 2017, claiming that Local 100 violated Title VII and the ADEA by discriminating based on race, sex, and age, and retaliating. *See* Compl. 4.

Then, in what Beck-Pell perceived to be a "response to [this] lawsuit," she "learned" (based on the language that Local 100 used in its Answer in this lawsuit) that she had been "expelled by the Union" even though she "ha[d] never received any charges against [her] to support expulsion." 2018 EEOC Charge; Pl.'s Opp'n 5, ¶ 9; *see* Ans. 2, ECF No. 14 (stating that Beck-Pell was "expelled"). *But see* LaBille Decl. ¶ 32 (stating that Local 100 "has taken no action with respect

to Beck-Pell's membership since suspending her for non-payment of dues in November 2014"). She amended her complaint in October 2017, Am. Compl., and completed another EEOC Charge on March 18, 2018, *see* 2018 EEOC Charge. In her Amended Complaint, she asserts that Local 100 was continuing to discriminate against her by not accepting her dues payments and reinstating her membership. Am. Compl. 6; *see* Pl.'s Opp'n 6 ("Ms. Beck-Pell['s] rights we[]re not violated all at once, they were violated throughout this whole process of trying to get employed in her profession.").

## Standard of Review

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). "A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Cole v. Prince George's Cty.*, 798 F. Supp. 2d 739, 742 (D. Md. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986).

## Title VII and ADEA Discrimination Claims

Plaintiff's claims are far from clear but, as best I can determine, Beck-Pell believes that Local 100 discriminated against her by failing to help her find employment, including by failing

to reinstate her membership to better her chances at employment, and by failing take any action on her behalf when she informed Local 100 representatives that job sites were discriminating in their hiring practices. *See* Am. Compl. 6; Compl. 6; Pl.'s Opp'n 4, 6.

> Title VII makes it unlawful for a labor organization
>
> (1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;
>
> (2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

42 U.S.C. § 2000e-2(c). "Under Subsection 2(c)(1), a labor union can be liable where it directly engages in discrimination by, for example, deliberately refusing to pursue [a discrimination] grievance on behalf of a plaintiff." *Murphy v. Adams*, No. DKC 12-1975, 2014 WL 3845804, at *11 (D. Md. Aug. 4, 2014). And, the ADEA similarly makes it unlawful for a union to discrimination against a member because of her age. 29 U.S.C. § 623(c).

To prevail on a Title VII or ADEA claim that Local 100 "fail[ed] to file [a] grievable discrimination claim," Beck-Pell must establish that "(1) she had a meritorious claim of discrimination; (2) she affirmatively requested that her union intervene to remedy the alleged discrimination; and (3) her union deliberately refused or failed to act on that request for discriminatory reasons." *Murphy*, 2014 WL 3845804, at *12 (noting that the Fourth Circuit had not addressed Title VII prima facie case and citing district court cases from other districts); *Bader v. Air Line Pilots Ass'n*, 113 F. Supp. 3d 990, 994 (N.D. Ill. 2015) (noting that "ADEA's substantive provisions concerning discrimination are similar to those of Title VII of the Civil

Rights Act"). An inference of a discriminatory motive arises if "the union knows of actual discrimination and deliberately ignores a member's request"; otherwise, the plaintiff must produce "'evidence that individuals outside of plaintiff's class were more favorably treated.'" *Murphy*, 2014 WL 3845804, at *12 (citation omitted).

Beck-Pell's claim fails on each element. First, to prevail on a claim for discrimination against a contractor, Beck-Pell has to establish that "(i) [s]he belongs to a protected class, (ii) [s]he applied and was qualified for a job for which the [contractor] was seeking applicants, [and] (iii) despite h[er] qualifications, [s]he was rejected." *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 851 (4th Cir. 2001) (Title VII elements of prima facie case); *see Bader*, 113 F. Supp. 3d at 994 (noting that "ADEA's substantive provisions concerning discrimination are similar to those of Title VII of the Civil Rights Act"). She also has to demonstrate that either "(iv) after h[er] rejection, the position remained open and the [contractor] continued to seek applicants from persons of h[er] qualifications," *EEOC*, 243 F.3d at 851, or, if "the position sought was filled, . . . that someone outside of the plaintiff's protected group ultimately was selected for the position." *Venable v. Pritzker*, No. GLR-13-1867, 2014 WL 2452705, at *13 (D. Md. May 30, 2014) (quoting *Langerman v. Thompson,* 155 F. Supp. 2d 490, 495 (D. Md. 2001)), *aff'd,* 610 Fed. App'x 341 (4th Cir. 2015); *see Bader*, 113 F. Supp. 3d at 994. Although Local 100 admitted that, "at various times since 2009, males were hired," Ans. 2, Beck-Pell has not provided any evidence that a member of another class was hired instead of her on any occasion, or that the contractors continued to seek applicants with her credentials after failing to hire her. Thus, she has not shown that she has a meritorious claim of discrimination. *See Venable*, 2014 WL 2452705, at *13.

Second, she insists that she did not want to file a grievance against the contractors. Pl.'s Opp'n 4, ¶ 7. And third, when she aired her grievances to Local 100, they requested more

information and she failed to provide it.  Pl.'s Opp'n 4, ¶ 6; *see* Nov. 1, 2013 Ltr. to Beck-Pell, ECF No. 40-3, at 99; Beck-Pell Dep. 176:5–178:3.  Therefore, on the record before me, she cannot demonstrate that "her union deliberately refused or failed to act on that request for discriminatory reasons."  *Murphy*, 2014 WL 3845804, at *12.  Consequently, she cannot prevail on her discrimination claims against Local 100.  *See id.*

Insofar as Beck-Pell complains that Local 100 failed to take some action (other than filing a grievance) when she notified it that contractors were discriminating against her, a minority of "courts have held that labor unions may have a duty under some circumstances to intervene when the employer is discriminating." *Mayes v. Bd. of Educ. of Prince George's Cty.*, No. PJM 13-3770, 2014 WL 3973930, at *8 n.9 (D. Md. Aug. 12, 2014) (quoting *Bonilla v. Oakland Scavenger Co.*, 697 F.2d 1297, 1304 (9th Cir. 1982); citing *Howard v. Int'l Molders & Allied Workers Union*, 779 F.2d 1546, 1553 (11th Cir. 1986)).  But, this Court has held "with the majority view recognized by the Seventh Circuit" that "unions do not have a duty investigate or ameliorate employer discrimination."  *Id.* (citing *EEOC v. Pipefitters Ass'n Local Union 597,* 334 F.3d 656, 660–61 (7th Cir. 2003)).  Consequently, Beck-Pell cannot prevail on her discrimination claim that, beyond not filing a grievance, Local 100 failed to act in any other way on her behalf in response to employer discrimination.  *See id.*

Moreover, even if Local 100 had a duty to act, Plaintiff would have to establish that the contractors were discriminating for Local 100 to "be held liable for acquiescing to discriminatory and retaliatory conduct." *Mayes*, 2014 WL 3973930, at *8 (quoting *Byrd v. Balt. Sun Co.*, 279 F. Supp. 2d 662, 673 (D. Md. 2003)).  As discussed, she cannot make this showing on the record before me.  *See Venable*, 2014 WL 2452705, at *13.  Nor can she establish that Local 100 itself was discriminating against her by not allowing her to pay her dues, given that she testified at her

deposition that Local 100 was not refusing her dues payments because of her race, age, or sex. Beck-Pell Dep. 117:8–19.  Therefore, she cannot prevail on her discrimination claims against Local 100.

## Title VII and ADEA Retaliation Claims

Defendant argues that it is entitled to summary judgment on Plaintiff's retaliation claims because "Beck-Pell's Amended Complaint does not allege retaliation, and Beck-Pell has filed a new EEOC charge against Local 100 alleging retaliation, which is still pending." Def.'s Mem. 15. It also contends that Beck-Pell's retaliation claims are untimely and without merit.  *Id.*  In light of Ms. Beck-Pell's *pro se* status, I construe her Amended Complaint to include a claim that, in retaliation for the EEOC charge she filed in August 2014, Local 100 refused to accept her dues payments in 2017.[5]  Am. Compl. 6; *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (holding that courts should construe pleadings of self-represented litigants liberally).  And, it is undisputed that Beck-Pell tried, without success, to pay her dues in April and July 2017.  Pl.'s Opp'n 4, ¶ 9; Apr. 2, 2018 Witness Stmt. 2, ECF No. 43-12; 2018 EEOC Charge.  Accordingly, I will consider whether this claim is properly before this Court.

To exhaust her administrative remedies for purposes of Title VII and the ADEA, Beck-Pell must have filed a charge with the EEOC.  *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000); *see Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009), *abrogated on*

---

[5] Insofar as Plaintiff alleges in her Opposition that Local 100 expelled her in retaliation for filing this lawsuit, Pl.'s Opp'n 4–5, ¶ 9, she did not supplement her pleadings with this allegation, and her opposition is not a vehicle for amending her complaint. *See Whitten v. Apria Healthcare Grp., Inc.*, No. PWG-14-3193, 2015 WL 2227928, at *7 (D. Md. May 11, 2015).  Therefore, I will not consider this claim.  In any event, her alleged expulsion is the subject of her 2018 EEOC charge, which still is pending, and therefore the claim would be premature.  *See Davis v. N.C. Dep't of Corr.*, 48 F.3d 134, 140 (4th Cir. 1995).

*other grounds by Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1850–51 (2019) (exhaustion not jurisdictional). Beck-Pell filed an EEOC charge for discrimination in 2014 and, at the time she filed suit, she had received a right to sue letter regarding her 2014 EEOC charge. Typically, a claim like Beck-Pell's retaliation claim is considered administratively exhausted when the plaintiff already filed an EEOC charge and the perceived retaliation is in response to the previously-filed EEOC charge. *See Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992); *Hill v. W. Elec. Co.*, 672 F.2d 381, 390 n.6 (4th Cir. 1982). But, it is undisputed that, in March 2018—*after* she initiated this litigation—, she filed a charge with the EEOC alleging retaliation; both parties have attached the charge to their briefs. *See* ECF No. 40-3, at 127; ECF No. 43-13. Because she filed that EEOC charge, which post-dated the alleged retaliation, the retaliation claim needed to be included in the EEOC charge. *See Hunter v. Vilsack*, No. DKC-07-2655, 2010 WL 1257997, at *8 (D. Md. Mar. 26, 2010); *Cherry v. Bealefeld*, No. CCB-08-1228, 2010 WL 917421, at *7 (D. Md. March 9, 2010). As this Court has explained, the rule from *Nealon* and *Hill* does not apply if the claims "could have been raised in [the] EEOC charge, but were not." *Hunter*, 2010 WL 1257997, at *8.

> One of the primary reasons for allowing plaintiffs to allege retaliation for the first time in court is that plaintiffs who face retaliation after filing one EEOC charge will likely be reluctant to file additional charges for fear of further reprisal. *See Jones*, 551 F.3d at 302. Yet if a plaintiff faces retaliation and *then* chooses to file an EEOC complaint, there is little reason not to require her to exhaust her retaliation claim by including it in her EEOC charge. Therefore, the normal rules of exhaustion must apply to claims of retaliation that predate the filing of an EEOC charge.

*Cherry*, 2010 WL 917421, at *7; *see also Jones*, 551 F.3d at 303.

Indeed, Beck-Pell did include the retaliation charge in the 2018 EEOC charge. *See* ECF No. 40-3, at 127; ECF No. 43-13. Yet, more is required before filing suit: "receipt of, or at least entitlement to, a right-to-sue letter." *See Davis v. N.C. Dep't of Corr.*, 48 F.3d 134, 140 (4th Cir. 1995). Local 100 contends that the 2018 EEOC charge is still pending, Def.'s Mem. 15, and Beck-Pell has not shown otherwise. Accordingly, her retaliation claim is dismissed for failure to exhaust

administrative remedies.  *See Jones*, 551 F.3d at 300; *Smith*, 202 F.3d at 247; *Davis*, 48 F.3d at 140.

Moreover, even if Beck-Pell's claim were exhausted, she cannot prevail on a retaliation claim on the record before me.  Title VII and the ADEA both prohibit retaliation for engaging in a protected activity.  *See* 42 U.S.C. § 2000e–3(a) (Title VII); 29 U.S.C. § 623(d) (ADEA).  To establish retaliation, Beck-Pell must show "(i) 'that [she] engaged in protected activity,' (ii) 'that [the labor organization] took adverse action against [her],' and (iii) 'that a causal relationship existed between the protected activity and the adverse . . . activity.'" *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (Title VII) (quoting *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004), *abrogated on other grounds as stated in Foster*, 787 F.3d at 249); *see also Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 298 (5th Cir. 1994) ("We require a showing of three elements to make out a prima facie case of retaliation: (1) the plaintiff engaged in activity protected by the ADEA or Title VII; (2) an adverse employment action occurred; and (3) there was a causal connection between the participation in the protected activity and the adverse employment action") (footnotes omitted).

Plaintiff claims that Local 100's refusal to accept her dues in 2017 was in retaliation for the EEOC complaint she filed in 2014, more than two years earlier.  Too much time has passed for Plaintiff to establish a causal connection on timing alone.  *See Penley v. McDowell Cty. Bd. of Educ.*, 876 F.3d 646, 655–57 (4th Cir. 2017) ("In retaliation cases, a causal connection may exist where the employer takes adverse employment action against an employee shortly after learning of the protected activity," but "eight to nine months prior is not "very close'" and "cannot satisfy the causation prong of the prima facie case.").

Moreover, the Constitution and Ritual states that "[a]ny member who becomes two (2) months in arrears shall be recorded suspended" and "shall forfeit all rights, privileges, and benefits of membership." Const. & Ritual art. 16, § 11, ECF No. 40-3, at 120–21. "Notice is not necessary" prior to suspension. *Id.* at 120. Additionally, "No back dues shall be accepted from any member suspended in accordance with this Section and no official receipt shall be issued to record such dues after the expiration of the two (2) month limit." *Id.* Thus, when Beck-Pell attempted to pay dues in April 2017, more than two years after her late-2014 suspension, Local 100 could not accept her payment. *See id.* No reasonable jury could find retaliation on these facts, and Local 100 is granted summary judgment on Beck-Pell's retaliation claims.

## Other Claims

In her Opposition, for the first time, Ms. Beck-Pell argues that Local 100 "breach[ed] the duty of fair representation." Pl.'s Opp'n 6. An opposition to a dispositive motion is not a vehicle for amending a pleading. *See Whitten v. Apria Healthcare Grp., Inc.*, No. PWG-14-3193, 2015 WL 2227928, at *7 (D. Md. May 11, 2015). Moreover, Local 100's "system is a non-exclusive referral system." LaBille Decl. ¶ 5. Notably,

> [a] union's duty to act fairly and impartially derives from its status as the exclusive representative of employees in a specified unit. *Miranda Fuel Co.*, 140 NLRB 181 (1962), *enf. denied* 326 F.2d 172 (2d Cir. 1963). No duty of fair representation attaches, however, to a union's operation of a *non*exclusive hiring hall because that union lacks the power to put jobs out of the reach of workers. *Teamsters Local 460 (Superior Asphalt Co.)*, 300 NLRB 441 (1990).

*Carpenters Local 537 (E.I. Du Pont)*, 303 NLRB 419, 420 (1991). Therefore, Ms. Beck-Pell cannot prevail on a claim against Local 100 for breach of the duty of fair representation. *See id.* Accordingly, insofar as Ms. Beck-Pell's Complaint or Amended Complaint includes this claim, summary judgment is entered in Local 100's favor. *See id.*

Plaintiff also argues that, "under various PLAs [project labor agreements], and First Source, Local 100 is required to refer members to jobs with Contractors who are part of the PLA." Pl.'s Opp'n 5. But, she does not claim breach of District of Columbia First Source Law, D.C. Code §§ 2-219.01 – 2-219.05, or any project labor agreement in her Amended Complaint, and therefore cannot do so through her opposition. *See Whitten*, 2015 WL 2227928, at *7. Moreover, as Local 100 explains:

> The District of Columbia First Source law requires certain employers working on publicly-funded projects in the District of Columbia to hire a certain percentage of District of Columbia residents. D.C. Code § 2-219.03(e)(1)(A). Beck-Pell contends that because she is a District of Columbia resident, she should have benefitted from the First Source law. (Ex. C., Beck-Pell Tr. 115) She does not, however, offer any evidence that any sheet metal contractors signatory to agreements with Local 100 have failed to comply with the First Source law. (Ex. C., Beck Pell Tr. 139) Moreover, Beck-Pell does not have standing to enforce the District of Columbia First Source law. *There is no private right of action for enforcement of the requirements of the First Source law.* Instead, enforcement of the First Source law lies solely with the Mayor of the District of Columbia or her designee. D.C. Code § 2-219.03(e)(4)(A).

> Beck-Pell's claims concerning the project labor agreement for the District of Columbia Soccer Stadium fail for similar reasons. Her only argument in this regard appears to be that because she – as a District of Columbia resident – was not hired for work on the Soccer Stadium project, the contractors and Local 100 were not in compliance with the First Source requirements in the project labor agreement. (Ex. C., Beck-Pell Tr. 115)

> . . . Beck-Pell provides no evidence that any sheet metal contractors signatory to agreements with Local 100 failed to comply with the First Source requirements in the project labor agreement. (Ex. C., Beck-Pell Tr. 139) The mere fact that Beck-Pell did not obtain employment on the project does not demonstrate that Local 100 or its contractors were not in compliance with any of the agreement's requirements.

Def.'s Mem. 13–14 (emphasis added). Further, Beck-Pell's discrimination claims based on any unidentified project labor agreement fail because she "admitted in her deposition that she does not believe that any alleged adverse actions by Local 100 with respect to the First Source requirements in the project labor agreement were taken for discriminatory reasons." *Id.* at 14; *see* Beck-Pell Dep. 143:19–144:9. Accordingly, insofar as Plaintiff brought any claim based on the First Source

Law or an unidentified project labor agreement, summary judgment is entered in Local 100's

favor.  *See* Fed. R. Civ. P. 56(a).

## **ORDER**

For the reasons stated in this Memorandum Opinion and Order, it is, this 15th day of

August, 2019, hereby ORDERED that

1.  Local 100's Motion for Summary Judgment, ECF No. 40, IS GRANTED;

2.  Judgment IS ENTERED in Local 100's favor; and

3.  The Clerk SHALL CLOSE this case.


_____/S/_____
Paul W. Grimm
United States District Judge

lyb